UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONROE GROCERY, INC., a | : | CIVIL NO: 3:17-CV-00922 |
| Pennsylvania Corporation, and | : | |
| FRANCISCO TAVAREZ, an | : | (Magistrate Judge Schwab) |
| Individual, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OPINION**

## I. Introduction.

Plaintiffs Monroe Grocery, Inc. and Francisco Tavarez bring an equal

protection claim against the United States based on their disqualification from the

Supplemental Nutrition Assistance Program ("SNAP") after the United States

found that they had illegally trafficked in SNAP benefits.  They claim that the

United States treated Monroe Grocery—a small, privately owned grocery store—

differently from similar, publicly owned stores.  According to Monroe Grocery and

Tavarez, while the United States investigates and charges privately owned stores

with trafficking in SNAP benefits, it does not investigate and charge publicly

owned stores with trafficking in SNAP benefits.  Currently pending is the United

States' motion for summary judgment.  Because Monroe Grocery and Tavarez have not presented evidence from which a reasonable factfinder could conclude that the United States treated them differently from how it treated similarly situated, publicly owned stores, the United States is entitled to summary judgment.

## II.  Background and Procedural History.

When they began this action, Monroe Grocery and Tavarez were proceeding *pro se*, but counsel later entered an appearance on their behalf and filed an amended complaint.  The amended complaint named as defendants: (1) the United States of America; (2) Sonny Perdue, the Secretary of the United States Department of Agriculture ("USDA"); and (3) Gilda Torres, Section Chief of the Food and Nutrition Service of the USDA.  Monroe Grocery and Tavarez raised an equal protection claim and a due process claim.

The United States filed a motion to dismiss or, in the alternative, for summary judgment.  Adopting a Report and Recommendation of the undersigned, Judge Mannion granted in part and denied in part that motion.  He dismissed with prejudice the claims for damages against the defendants in their official capacities; he denied the motion as to the equal protection claim; and he dismissed the due process claim without prejudice, giving Monroe Grocery and Tavarez leave to file a second amended complaint.

2

Monroe Grocery and Tavarez then filed a second amended complaint

naming the United States as the only defendant and challenging the decision

permanently disqualifying them from the SNAP program.  Although 7 U.S.C.A.

§ 2023(a)(13) provides for judicial review to challenge such a final determination

decision, a complaint under that section must be filed within 30 days after delivery

or service of the final administrative decision. 7 U.S.C.A. § 2023(a)(13).  Monroe

Grocery and Tavarez concede that they filed this case more than 30 days after

delivery or service of the final administrative decision. *See Doc. 38* at 6 ("To be

flatly forthright, there is no denying that the Plaintiffs' initial complaint was filed

after the statutory deadline had passed.  The dates are what they are, and the math

is immutable.").  Thus, instead of proceeding under § 2023(a)(13), they present

constitutional claims: they present an equal protection claim and a due process

claim under the Fifth Amendment.[1]

---

[1] Although Monroe Grocery and Tavarez mention 42 U.S.C. § 1983 and the Fourteenth Amendment in their second amended complaint, because the United States is not a state actor and did not act under color of state law, neither 42 U.S.C. § 1983 nor the Fourteenth Amendment are applicable. *See Hindes v. F.D.I.C.*, 137 F.3d 148, 158 (3d Cir. 1998) ("Because section 1983 provides a remedy for violations of federal law by persons acting pursuant to state law, federal agencies and officers are facially exempt from section 1983 liability inasmuch as in the normal course of events they act pursuant to federal law."); *Martucci v. Borough*, No. CV 3:17-1671, 2018 WL 1755728, at *2 n.3 (M.D. Pa. Apr. 10, 2018) (noting that "the Fourteenth Amendment does not apply to plaintiff's claims against Ashmawy since plaintiff alleges that he is a federal officer").  Although we noted this in our Report and Recommendation with respect to the amended complaint,

After the United States filed an answer to the amended complaint, it filed a motion for partial judgment on the pleadings seeking judgment as to the due process claim.  The court denied that motion.  The parties later consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.

In April 2021, the United States filed a motion for summary judgment.  A little over a month later, in accordance with the parties' stipulation, we dismissed the due process claim (Count II of the Second Amended Complaint) as moot and with prejudice.  Thus, the only remaining claim is the equal protection claim.[2]  The parties have briefed the motion for summary judgment as to the equal protection claim.  For the reasons set forth below, we will grant the United States' motion for summary judgment.

## III.  Summary Judgment Standards.

The United States moves for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant

---

Monroe Grocery and Tavarez still mention § 1983 and the Fourteenth Amendment in their second amended complaint.

[2] Tavarez testified that Monroe Grocery ceased operations in 2019. *See doc. 111-4* at 8.  Nevertheless, for ease of reference and because the equal protection claim pertains to the United States' treatment of Monroe Grocery, from here on, we will refer to Monroe Grocery and Tavarez collectively as simply Monroe Grocery.

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing

5

that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).  At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made

7

in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.  Material Facts.

Local Rule 56.1 requires a party moving for summary judgment to file "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1.  The Rule, in turn, requires the non-moving party to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required [by the moving party], as to which it is contended that there exists a genuine issue to be tried." *Id.*  The "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements," and "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *Id.*  "Local Rule 56.1 was promulgated to bring greater efficiency to the work of the judges of the Middle District." *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018).  "[T]he Rule 'is essential to the Court's resolution of a summary judgment motion' due to its role in 'organizing the evidence, identifying undisputed facts, and demonstrating precisely how each

8

side proposed to prove a disputed fact with admissible evidence.'" *Id*. (citations omitted).

Here, in accordance with M.D. Pa. 56.1, the United States filed a statement of material facts (*doc. 102*), and Monroe Grocery filed a response (*doc. 112*). Although admitting most of the United States' facts, Monroe Grocery purports to deny several of the facts set forth by the United States. But it does not cite to evidence to create a genuine factual dispute as to those facts. Aware of our duty to "construe all facts and inferences in favor of the nonmoving party[,]" *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)), because Monroe Grocery has not cited evidence to create a genuine factual dispute, we nevertheless accept the facts set forth by the United States.

In addition to responding to the United States' statement of material facts, in a section of its response titled "The Plaintiffs' Facts in Opposition to Summary Judgment," Monroe Grocery sets forth additional facts. *See doc. 112* ¶¶ 53–59. The United States responded to Monroe Grocery's additional facts, admitting all but a few of them. *See doc. 129*. Again, because Monroe Grocery is the nonmoving party, we construe all facts and inferences in its favor.[3]

---

[3] Monroe Grocery sprinkled additional facts in its brief, sometimes—but not always—providing citations to the record. *See doc. 111* (*passim*). Asserting additional facts in a brief defeats the purpose of M.D. Pa. 56.1. Thus, we will not

The following facts are the material facts for purposes of the pending

summary judgment motion.

### A. How the USDA identifies retailers that are potentially violating SNAP regulations.

#### 1. In General.

The Food and Nutrition Service ("FNS") of the USDA ensures that all

legitimate retailers comply with SNAP regulations. *Doc. 102* ¶ 1; *Doc. 112* ¶ 1.  It

uses a variety of methods to identify possible violators, who are then referred for

compliance actions and sanctions, as appropriate. *Id.*

The Case Screening Branch is the primary source for assistance with

interpreting Electronic Benefits Transfer ("EBT") transaction patterns for the

Investigative Analysis Branch. *Id.*  It uses three methods to identify possible

program violators: (1) a WATCH LIST generated from its Anti-Fraud Locator

Using EBT Retailer Transactions ("ALERT") computer program; (2) data mining

using the ALERT system, and (3) complaints or leads. *Id.* ¶ 3.

The ALERT system is a database that contains all the EBT transactions

conducted at SNAP-authorized retailers by SNAP-authorized clients. *Id.* ¶ 9.  It is

an anti-fraud tool that monitors and tracks retailer-transaction activity, SNAP-

---

recite those additional facts here.  Nevertheless, having considered them, we
conclude that they do not change the outcome as to the pending motion for
summary judgment.

transaction activity, and allows compliance analysts to monitor the activity at specific retailers. *Id*. ¶¶ 7–8.  The Case Screening Branch identifies possible retail violators through review of the WATCH LIST, which is populated by the ALERT system. *Id*. ¶ 2.  The WATCH LIST weighs various numbers including those obtained from scans run through ALERT; the store type affects the results. *Id*. ¶ 5.  Cases originating from the WATCH LIST account for approximately twenty percent of Case Screening Branch cases. *Id*. ¶ 4.  The largest number of Case Screening Branch cases originate from data mining. *Id*. ¶ 6.

FNS also maintains a database named STARS that contains information including store name, store location, store type, and store status. *Id*. ¶ 10.  There are numerous store (or firm or retailer) types, including convenience store, small grocery store, medium grocery store, large grocery store, supermarket, and superstore. *Id*. ¶ 12.  All store types—including superstores—are included in the ALERT system and the STARS system and may be searched by a user. *Id*. ¶ 11.  A three-step process is used to review retailers: (1) screen pending entries; (2) analyze all available information to determine appropriate action; and (3) determine the final action and record that action in STARS. *Id*. ¶ 13.

The Case Screening Branch considers the following factors when reviewing stores on the WATCH LIST: number of hits within ALERT scans; number of transactions; number of scans; redemption patterns; dollar amount of transactions;

average transaction amount; terminal IDs; store inventory; store location;

comparable stores; store type and accuracy; store ownership; previous WATCH

LIST history and compliance actions; ALERT rank; household shopping patterns;

and complaints. *Id*. ¶ 14.  And it has five options when reviewing a store on its

WATCH LIST: (1) establish an EBT case and refer the case to the Investigative

Analysis Branch; (2) send a request for investigation to the Retailer Investigations

Branch; (3) send a voluntary compliance letter; (4) mark the store for analysis; or

(5) determine that no further action is warranted. *Id*. ¶¶ 2, 15.

### 2.  Supermarkets and Superstores.

Supermarkets and superstores are typically referred for investigation through

complaints. *Doc. 102* ¶ 23; *Doc. 112* ¶ 23.  From 2016 through 2020, FNS

conducted at least 50 investigations of superstores and supermarkets, and it

sanctioned 15 superstores and 15 supermarkets for SNAP violations, including one

superstore that was permanently disqualified for trafficking SNAP benefits. *Id*.

¶¶ 20–21.  Although supermarkets and superstores are included in the ALERT

system, supermarkets and superstores are not subject to the ALERT scans that

identify stores for placement on the WATCHLIST because given the scale of such

stores, scan results are easier to explain based on a store's inventory and repeat

business, and given that the store may be running EBT transactions through one

12

register, false positives for rapid transactions may be generated. *Id.* ¶¶ 11, 22, 24.

Based on its institutional knowledge and years of experience with the SNAP

program, FNS has concluded that, in general, smaller stores have a higher

likelihood of trafficking than larger stores. *Id.* ¶ 25.[4]

**B.  Monroe Grocery was permanently disqualified from SNAP.**

Monroe Grocery, organized as a privately owned corporation owned and

managed by Tavarez, became an authorized SNAP retailer on June 19, 2015. *Doc.*

*102* ¶¶ 27–28; *Doc. 112* ¶¶ 27–28.  After the ALERT System indicated that

---

[4] This statement is supported by the deposition testimony of Alexander
Wilson, a supervisory program specialist with the Case Screening Branch of FNS.
*See doc. 102-1* at 5–6, 23–24.  Monroe Grocery purports to deny this statement,
asserting that the USDA does not investigate certain types of stores and just lets
them police themselves: "The USDA has wholly failed to investigate certain types
of stores, thus failing to find violations because they haven't been looking.
Instead, the USDA maintains that it has allowed those stores to police themselves,
thus violations are not reported because the enforcement is done by the violating
store." *Doc. 112* ¶ 25.  In support of its denial, Monroe cites the testimony of
Douglas Wilson. *Id.*  Douglas Wilson is a program analyst and ALERT Program
Manager. *See doc. 123-3* at 15.  After testifying that the ALERT system does not
flag superstores and supermarkets and being asked why that is, Douglas Wilson
testified:

> A  Superstores and supermarkets typically have their own
> fraud prevention system.  And the high percentage of fraud is
> usually committed in the smaller stores.
> Q  So functionally and, again, your personal knowledge,
> the USDA just trusts those stores to police themselves?
> A  To my knowledge, yes.

*Id.* at 68.  This testimony does not raise a genuine factual dispute that FNS has
concluded, based on its institutional knowledge and experience, that, in general,
smaller stores have a higher likelihood of trafficking than larger stores.

Monroe Grocery's EBT data for May through October 2016, contained patterns that were consistent with possible trafficking, the Retailer Operations Division of FNS began an investigation. *Id*. ¶ 29.

A contractor for FNS visited Monroe Grocery, whose stocking pattern at the time was consistent with that of a small grocery store. *Id*. ¶¶ 30–31. This store visit revealed that Monroe Grocery had one cash register, an optical scanner, and one EBT point-of-sale device, but it had no shopping carts and only four shopping baskets. *Id*. ¶¶ 32–33. It did not sell hot foods or foods for on-site consumption, and it did not offer meat/seafood specials or bundles or fruit/vegetable boxes for sale. *Id*. ¶ 34. It did have a deli/prepared-food section, but there were no per-pound prices posted for the meat and cheese. *Id*. ¶ 35. The contractor documented various categories of items—dairy; fruit and vegetable; bread and cereal; and meat, poultry, and fish—that were available, as well as the amounts of each. *Id*. ¶ 36. The contractor also provided a layout of the public areas of Monroe Grocery and took photos of its interior and exterior. *Id*. ¶ 37.

Analyzing the information gathered from the store visit, the Retailer Operations Division determined that Monroe Grocery's stock consisted of mostly inexpensive food items, such as canned goods, pasta, oils, instant soups, infant foods, juices, fresh and frozen vegetables, snacks, and soft drinks for immediate consumption off-premises. *Id*. ¶ 38. It noted that Monroe Grocery had a marginal

14

number of items (mostly small) on sale, that it had a fair-to-moderate stock of

expensive deli meats, but that it did not stock fresh/frozen meats, poultry, seafoods,

or baby formula. *Id.* ¶ 39.

Analyzing Monroe Grocery's EBT data, the Retailer Operations Division

found suspicious transaction patterns that fell into two categories: (1) rapid and

repetitive transactions in a short period of time from the same household, and

(2) high dollar transactions. *Id.* ¶ 40. It compared the transaction data to Monroe

Grocery's physical makeup and inventory and to the traditional behavior of SNAP

beneficiaries, and it determined that those two patterns were suspicious, and likely

indicative, of trafficking. *Id.* ¶ 41. The Retailer Operations Division also

ascertained that within a one-mile radius of Monroe Grocery, there were 12 other

SNAP-authorized stores of equal or greater store type, including three

supermarkets, four medium groceries, and five small groceries. *Id.* ¶ 42.

Comparing Monroe Grocery's EBT data against the five nearby small groceries,

the Retailer Operations Division found that Monroe Grocery had significantly

more questionable transactions in the categories at issue than the comparable

stores. *Id.* ¶ 43. And comparing EBT data from Monroe Grocery to average-

redemption data for small grocery stores in Pennsylvania during the review period,

the Retailer Operations Division found that Monroe Grocery's redemptions

significantly exceeded the average. *Id.* ¶ 44. Also, reviewing the shopping patterns

of selected households that were involved in suspicious transactions during the review period, the Retailer Operations Division found that many of those households were also shopping at larger and better stocked stores, in many cases making these shopping visits on the same day (or close in time) to a suspicious transaction. *Id*. ¶ 45.  Following this review, the Retailer Operations Division concluded that the evidence warranted issuing a trafficking Charge Letter to Monroe Grocery. *Id*. ¶46.

Near the end of 2016, Gilda Torres, Section Chief of the Retailer Operations Division, sent a Charge Letter to Monroe Grocery. *Id*. ¶ 47.  The Charge Letter informed Monroe Grocery that an analysis of its EBT transactions for May through October 2016, established clear and repetitive patterns of unusual, irregular, and inexplicable activity for Monroe Grocery's type of store. *Id*. ¶ 48.  It further informed Monroe Grocery that it was being charged with trafficking, as defined by 7 C.F.R. § 271.2, and was being considered for a permanent disqualification from SNAP. *Id*. ¶ 49.  About a month later, FNS issued its determination letter, informing Monroe Grocery of its conclusion that the violations alleged in the Charge Letter occurred and of the imposition of a permanent disqualification for the trafficking violations. *Id*. ¶¶ 50–51.  And in April 2017, the USDA issued its Final Agency Decision concluding that there was sufficient evidence to support permanently disqualifying Monroe Grocery from participation in SNAP. *Id*. ¶ 52.

16

Monroe Grocery was similar in size, inventory, and disposition to other SNAP retailers that are publicly owned. *Doc. 112* ¶ 53; *Doc. 129* ¶ 53.


### C.  The USDA's Treatment of Publicly Owned Retailers.

#### 1.  Numbers.[5]

In 2017, there were 283,279 authorized SNAP retailers, 85,477 of which were operated by publicly owned companies. *Doc. 112* ¶¶ 54–55; *Doc. 129* ¶¶ 54–55.

From 2008 through 2018, FNS issued 18 charge letters to publicly owned corporations. *Doc. 102* ¶ 16; *Doc. 112* ¶ 16.  From 2008 through May 29, 2019, FNS issued 34 warning letters to publicly owned corporations. *Id.* ¶ 17.

From 2015 through 2016, FNS investigated 28 publicly owned stores. *Doc. 102* ¶ 18; *Doc. 112* ¶ 18; *Doc. 129* ¶ 56.  These investigations resulted in positive results in four cases. *Doc. 112* ¶ 56; *Doc. 129* ¶ 56.  As a result of these investigations, the USDA issued only one charge letter. *Id.*  It issued warning letters to the other three companies. *Doc. 129* ¶ 56.

Other than the store mentioned below (Stripes 40678), the USDA did not issue a charge letter that resulted in a determination of trafficking as to any other

---

[5] As set forth below, the parties provide numbers for various things.  But because the relevant time-frame is not the same for these various numbers, it is difficult to set forth a clear narrative of what the numbers purportedly show.

publicly owned SNAP retailer between May 22, 2008, and October 23, 2017. *Doc. 112* ¶ 58; *Doc. 129* ¶ 58.[6]  USDA program specialist and section chiefs are aware of a store's ownership type at all stages of case screening and investigation. *Id.* ¶ 59.

FNS does not have any guidance or policy that treats publicly owned stores differently from privately owned stores. *Id.* ¶ 26.[7]

### 2. Stripes 40678.

On April 2, 2009, the USDA issued a Charge Letter in an EBT-Analysis case for the store Stripes 40678. *Doc. 112* ¶ 57; *Doc. 129* ¶ 57.  That store's corporate owner was 7-Eleven. *Id.*  In August 2009, the USDA issued a permanent disqualification of that store based on trafficking, but the store was later reinstated to SNAP. *Doc. 129* ¶ 57.

---

[6] Monroe Grocery contends that the USDA did not charge any publicly owned SNAP retailer with trafficking between those dates. *Doc. 112* ¶ 58.  But the chart it cites—"Charge Letters Sent to Stores Owned by Publicly Owned Corporations Since 01/01/08 (produced 08/01/19)"—shows that charge letters were issued to other publicly owned retailers during those dates. *See doc. 111* at 2.

[7] Although Monroe Grocery admits that there is no written policy treating publicly owned stores differently from privately owned stores, it asserts that "[a] unwritten albeit conscious policy plainly exists." *Doc. 112* ¶ 26.  In support of that assertion, Monroe Grocery cites a chart titled "Charge Letters Sent to Stores Owned by Publicly Owned Corporations Since 01/01/08 (produced 08/01/19)." *Id.* (citing *Doc. 111* at 2).  A chart listing Charge Letters sent to publicly owned stores does not, without more, support Monroe Grocery's assertion that there is an unwritten policy of treating publicly owned and privately owned stores differently.

The information in the record regarding Stripes 40678 is from a chart titled "Charge Letters Sent to Stores Owned by Publicly Owned Corporations Since 01/01/08 (produced 08/01/19)." *Doc. 111* at 2.[8]  That chart shows that a Charge Letter was sent on April 2, 2009. *Id.*  The chart also shows, among other things, that: "7-Eleven" was listed under the heading "Corporation Name," that "EBT Data" was listed under the heading "Type of Case," that "PDQ (8/3/2009)" was listed under the heading "Resulting Determination," and that "Authorized" was listed under the heading "Current Status." *Id.*  Finally, the chart shows that the following comment was listed under the heading "Notes": "Reinstated 8/24/2009. Comment in STARS: 'Address and ownership info not correct in STARS so charge letter did not reach the proper person for response.'" *Id.*

## V. Discussion.

Monroe Grocery claims that the United States treated it differently from similarly situated, publicly owned stores in violation of the equal protection component of the Fifth Amendment.  The United States contends that it is entitled to summary judgment because it does not treat publicly owned stores differently from privately owned stores of the same size and characteristics.  Because Monroe Grocery has not presented evidence from which a reasonable finder of fact could

---

[8] Both the United States and Monroe Grocery cite to this chart. *See Doc. 112* ¶ 57; *Doc. 129* ¶ 57.

conclude that the United States treated it differently from similarly situated, publicly owned stores, the United States is entitled to summary judgment.

"Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has construed the Fifth Amendment's Due Process Clause as containing an equal protection guarantee." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 n.112 (3d Cir. 2016) (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991)).  "Fifth Amendment equal protection claims are examined under the same principles that apply to such claims under the Fourteenth Amendment." *Abdul–Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir. 2001).

The Equal Protection Clause directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.[9]

Under the traditional theory, "[t]o prevail on its equal protection claim, [a plaintiff] must show that the Government has treated it differently from a *similarly* situated party *and* that the Government's explanation for the differing treatment does *not* satisfy the relevant level of scrutiny." *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 348 (3d Cir. 2017).  Where, as here, the classification at issue does not involve a suspect class or target a

---

[9] Because Monroe Grocery does not specify under which theory it is proceeding, we address both theories.

fundamental right, "rational basis review is the applicable standard." *Id*.; *see also*

*Romer v. Evans*, 517 U.S. 620, 631 (1996) (stating that "if a law neither burdens a

fundamental right nor targets a suspect class, we will uphold the legislative

classification so long as it bears a rational relation to some legitimate end").  Under

the traditional theory a plaintiff "must prove the existence of purposeful

discrimination" by the defendant. *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d

Cir. 1992).

Under the class-of-one theory, a plaintiff may advance an equal protection

claim absent membership in a protected class if the plaintiff shows that the

defendants engaged in irrational and intentional differential treatment of him when

compared with similarly situated others. *See Village of Willowbrook v. Olech,* 528

U.S. 562, 564 (2000); *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir.

2006).  To prevail on a class-of-one claim, the plaintiff must demonstrate that:

(1) the defendant treated him differently from others similarly situated; (2) the

defendant did so intentionally; and (3) there was no rational basis for the difference

in treatment. *Hill,* 455 F.3d at 239.

**A.  Monroe Grocery was not similarly situated to supermarkets or superstores, and the United States had a rational basis for treating supermarkets and superstores differently from how it treated smaller stores, such as Monroe Grocery.**

The United States asserts that Monroe Grocery was not similarly situated to supermarkets and superstores, and, in any event, it had a reasonable basis to treat supermarkets and superstores differently from small grocery stores, such as Monroe Grocery.

To succeed under either the traditional or class-of-one theory, Monroe Grocery "must demonstrate that it was treated differently from other similarly situated entities." *Rouse v. City of Pittsburgh*, 728 F. App'x 161, 164 (3d Cir. 2018) (citing *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (selective enforcement); *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (class of one)).  But "similarly situated does not mean identically situated." *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (citations and internal quotation marks omitted).  Rather, entities or individuals "are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)).  Whether entities or individuals are similarly situated is a "'case-by-case fact-intensive inquiry.'" *McLaughlin v. Forty Fort Borough*, 64 F. Supp.3d 631, 648 (M.D. Pa. 2014) (quoting *Suber v. Guinta*, 902 F. Supp.2d 591, 607 (E.D. Pa. 2012)).

It is undisputed that FNS classifies stores into several categories—convenience stores, small grocery stores, medium grocery stores, large grocery stores, supermarkets, and superstores. *See doc. 102* ¶ 12; *doc. 112* ¶ 12.  The parties have not explained to the court how these various categories of stores are defined, but it appears that size is at least one factor that differentiates the categories.  As the plaintiff, it is Monroe Grocery's burden to show that it was similarly situated to other entities.  Here, however, Monroe Grocery, which was categorized as a small grocery store, has not presented evidence from which a reasonable trier of fact could conclude that it was similarly situated to supermarkets or superstores.[10]

Further, Monroe Grocery has not shown that the United States did not have a rational basis for treating smaller stores, such as small grocery stores like it, differently from lager stores, such as supermarkets and superstores.

Under either the traditional or class-of-one theory, Monroe Grocery must show that there was no rational basis for the difference in treatment.  Under rational basis review, the court seeks to ensure "that the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler v. Doe*, 457 U.S. 202,

_____

[10] Monroe Grocery does not specifically argue that that it was similarly situated to supermarkets and superstores, but it does assert that "[a]ll SNAP retailers, regardless of size, are supposed to be equally subject to the Defendant's rules and regulations . . . ." *Doc. 111* at 20.  Thus, we address here whether Monroe Grocery was similarly situated to supermarkets and superstores.

216 (1982). "The legitimate purpose 'may be based on rational speculation unsupported by evidence or empirical data.'" *Cabrera v. Att'y Gen. United States*, 921 F.3d 401, 404 (3d Cir. 2019) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). "And rational-basis review 'confers a presumption of validity' . . . that must be rebutted by the challenger." *Id.* (quoting *Real Alternatives, Inc.*, 867 F.3d at 348). "Furthermore, under the rational-basis standard, [the plaintiff] 'must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational.'" *Id.* (quoting *Brian B. ex rel. Lois B. v. Com. of Pennsylvania Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir. 2000)). In sum, "[r]ational basis review is a very deferential standard." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018). "It is met 'if there is any reasonably conceivable state of facts that could provide a rational basis' for the differing treatment." *Id.* (quoting *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007)).

As set forth above, FNS does investigate supermarkets and superstores albeit differently from how it investigates smaller stores in that investigations of supermarkets and superstores are typically initiated through complaints rather than ALERT scans. *Doc. 102* ¶¶ 20–24; *Doc. 112* ¶¶ 20-24. And the United States has explained why ALERT scans are not used for supermarkets and superstores: they are not subject to the ALERT scans that identify stores for placement on the

WATCHLIST because given the scale of such stores, scan results are easier to explain based on a store's inventory and repeat business, and given that the store may be running EBT transactions through one register, false positives for rapid transactions may be generated. *Id*. ¶¶ 22, 24. Further, FNS has concluded that based on its institutional knowledge and years of experience with the SNAP program, in general, smaller stores have a higher likelihood of trafficking than larger stores. *Id*. ¶ 25. Based on these undisputed facts, that United States has a rational basis for treating supermarkets and superstores differently from smaller stores, such as Monroe Grocery.

### B. Monroe Grocery has not shown that the United States treated it differently from how it treated similarly situated, publicly owned stores.

With supermarkets and superstores out of the mix as relevant comparators, we turn to Monroe Grocery's contention that it was "similar enough in size, inventory and business operation to be situated similarly to a convenience store or medium grocer." *Doc. 111* at 20. Based on this, according to Monroe Grocery, it was similarly situated to publicly owned stores "like 7-Eleven, Dollar General, and other retailers." *Id*. In support of its assertion, Monroe Grocery cites the deposition testimony of Alexander Wilson. *Id*. Wilson testified that in some areas of the country and in some circumstances, a small grocery store may be similar to a convenience store or a medium grocery store:

A.  A small grocery has a - - usually a more - - more staple foods, more perishables than a convenience store, but not - - not a huge amount there.

The sales income, I think the threshold there is maybe 250,000 per year.

The difference in terms of the formula is also convenience stores, typically it's less than 65 percent sales in staple foods.  Small grocery would have more than 65 percent. That said, there are some - - some parts of the country where there - - I would say there's overlap in those types, particularly a place like New York, where we have the corner stores they call "bodegas" often.  They're maybe not - - they usually have a deli section.  They're not necessarily - - you know, if you just say "convenience store," I think most people would probably think of like a 7-Eleven.  A corner store in New York doesn't feel like a 7-Eleven when you walk in.  But in the end in terms of what is available and what might be expected out of these businesses, it's not far off.

And we do - - you know, we do see situations where there might be a store typed as a small grocery and a small - - and one typed as a convenience store, where they're actually pretty similar.  That would be just something we have to take into account if we're doing analysis.

There may be other places where there are stores typed as small grocery that really are more totally devoted to eligible foods and have perishables.  Some of the, kind of, ethnic specialty stores at times have ended up in that category.

So there's certainly - - in our analysis, there's some judgment to be made about the types.  It's a, kind of an artificial thing - - you know, aspect of the program that helps us manage the stores and look at them.  But it's  - -  you know, there are places where it's not, you know, not an exact science.

Q.  And would that also apply to comparing a small grocery store to a medium grocery?

A.  Yes.

26

*Doc. 123-4* at 16–17.  While Wilson testified that under some circumstances a small grocery store may be comparable to a convenience store or a medium grocery store, he did not testify that Monroe Grocery was similar to a convenience store or a medium grocery store.  And Monroe Grocery has not pointed to evidence that supports an inference that it fell within the circumstances of when a small grocery store could be considered similar to a convenience store or to a medium grocery store.  More to the point, Monroe Grocery has not pointed to evidence that it was similarly situated to a 7-Eleven or Dollar General, the publicly owned stores it points to in its brief.[11]  In sum, Monroe Grocery has not pointed to evidence from which a reasonable trier of fact could conclude that it was similar to convenience stores or medium grocery stores.

Further, Monroe Grocery has not presented evidence from which a reasonable trier of fact could conclude that the United States intentionally treated it differently from similarly situated, publicly owned stores.  Monroe Grocery

---

[11] In the argument section of its brief, Monroe Grocery points to 7-Eleven and Dollar General as examples of stores to which it purportedly was similarly situated. *See doc. 111* at 20.  In the factual background section of its brief, it also asserts that it was similar to other publicly owned stores. *See id*. at 15 (listing Casey's General Store, CVS, Dollar Tree, Family Dollar Store, Rite Aid, Speedway, and Walgreens).  In addition to failing to include such factual assertions in its Rule 56.1 statement of facts, Monroe Grocery does not cite any evidence in support of such assertions.  Instead of pointing to evidence to support such assertions, Monroe Grocery contends that they are based on a "list of SNAP retailers from 2017," which was produced by the United States, but which Monroe Grocery has "not attached hereto because of its significant volume[.]" *Id*.

attempts to present evidence of such intentional differential treatment by two methods: (1) by comparing the number of publicly owned retailers that are sanctioned under the SNAP program to the number of privately owned retailed that are sanctioned under the SNAP program; and (2) by pointing to one instance where although a publicly owned store was sanctioned, that sanction was later rescinded. Discussing each method below, we conclude that Monroe Grocery has failed to create a genuine material factual dispute about whether it was intentionally treated differently from similarly situated, publicly owned stores.

As to the numbers, Monroe Grocery asserts that "[l]ess than four-hundredths of one percent (.035%)[12] of the SNAP retailer sanctions issued by the Defendant over the course of a decade (2008-2018) were issued to publicly owned companies . . . despite the fact that 30.17%[13] of the entire SNAP retailer population is

---

[12] It appears that this percentage is based on numbers Monroe Grocery set forth in its brief, but not in is Rule 56.1 statement of facts.  In its brief, Monroe Grocery asserts that "[a]ccording to the Department's records, between 2008 and 2018, there were 22,795 compliance actions taken against SNAP retailers (including term disqualifications, permanent disqualifications, hardship civil penalties, and trafficking civil money penalties)." *Doc. 111* at 12.  And, it continues, "[o]f all of these compliance actions, only eight (8) were taken against publicly held corporations—and of those eight, only one was permanently disqualified." *Id.*  When expressed as a percentage, 8 divided by 22,795 equals .035%.

[13] This 30.17% figure is apparently based on the undisputed fact that in 2017, there were 283,279 authorized SNAP retailers, 85,477 of which were operated by publicly owned companies. *Doc. 112* ¶¶ 54–55; *Doc. 129* ¶¶ 54–55. When expressed as a percentage, 85,477 divided by 283,279 is 30.17%.  Monroe

comprised of publicly owned businesses." *Doc. 111* at 21.[14]  Without specifically

addressing these numbers, the United States points out that it does not have a

policy or practice to treat privately owned small grocery stores differently from

publicly owned small grocery stores, and it emphasizes that Monroe Grocery must

show more than a discriminatory effect—it must show purposeful discrimination.

Here, neither party has briefed how the use of statistics may be used to prove

purposeful discrimination in the present context.  Further, while Monroe Grocery

characterizes the numbers as "wildly disproportionate"[15] and refers to the "law of

averages,"[16] Monroe Grocery has not presented a statistical theory.  *Cf.* 8 Emp.

Coord. Employment Practices § 107:101 (West 2022 update) ("Statistical

calculations performed on data in discrimination cases are not probative of

anything without support from an underlying statistical theory.").  Moreover,

---

Grocery has not explained why it uses this percentage from one particular year
(2017) when it is otherwise addressing a decade (2008-2018) of sanctions.

[14] At another point in its brief, Monroe Grocery refers to the .035 % figure in
connection not only with sanctions but with respect to Charge Letters and
sanctions. *See doc. 111* at 16 ("The numbers don't lie: 30.17% of all SNAP
retailers in the nation are publicly traded yet account for less that four hundredths
of one percent (.035%) of the USDA's Charge Letters and sanctions.").

[15] *See doc. 111* at 22 ("The number of publicly owned businesses is wildly
disproportionate to the number of Charge Letters issued to them.").

[16] *See doc. 111* at 25 ("The law of averages alone would suggest that the
publicly owned businesses should show up regularly, even if less than their
proportionate representation—but not virtually never.").

Monroe Grocery has not provided numbers for the relevant comparison: privately owned small grocery stores vs. publicly owned small grocery stores.[17]  In sum, Monroe Grocery has not created a genuine factual dispute about whether the United States purposefully treated it differently from similarly situated, publicly owned stores based on the numbers it sets forth.

Monroe Grocery also tries to show purposeful discrimination by pointing to the treatment of the Stripes 40678 store.  As set forth above, on April 2, 2009, the USDA issued a Charge Letter in an EBT-Analysis case for the store Stripes 40678, which was owned by 7-Eleven. *Doc. 112* ¶ 57; *Doc. 129* ¶ 57.  In August 2009, the USDA issued a permanent disqualification of that store based on trafficking, but the store was later reinstated to SNAP. *Doc. 129* ¶ 57.

Monroe Grocery has not presented evidence that it was similarly situated to the Stripes store.  Further, although Monroe Grocery suggests that when the USDA disqualified this Stripes store, it believed it was owned by someone other than 7-Eleven (a publicly owned company), and after the USDA discovered that the owner was actually 7-Eleven, the USDA withdrew the charge letter and disqualification and never charged 7-Eleven.  But the one document cited by

---

[17] As set forth above, Monroe Grocery has not presented facts from which a reasonable trier of fact could conclude that it was similarly situated to either convenience stores or medium grocery stores.  But even if it had, it has not presented numbers for how many privately owned convenience stores and small and medium grocery stores vs. how many publicly owned convenience stores and small and medium grocery stores the United States investigated and sanctioned.

Monroe Grocery does not support the inferences that Monroe Grocery contends that it does.

The document that Monroe Grocery cites is the chart titled "Charge Letters Sent to Stores Owned by Publicly Owned Corporations Since 01/01/08 (produced 08/01/19)." *Doc. 111* at 2. As to Stripes 40678, that chart shows that a Charge Letter was sent on April 2, 2009. *Id.* The chart also shows, among other things, that: "7-Eleven" was listed under the heading "Corporation Name," that "EBT Data" was listed under the heading "Type of Case," that "PDQ (8/3/2009)" was listed under the heading "Resulting Determination," and that "Authorized" was listed under the heading "Current Status." *Id.* Finally, the chart shows that the following comment was listed under the heading "Notes": "Reinstated 8/24/2009. Comment in STARS: 'Address and ownership info not correct in STARS so charge letter did not reach the proper person for response.'" *Id.* The limited information from the chart does not support an inference that the USDA initially thought Stripes 40678 was privately owned and only changed its position regarding Stripes 40678 after it learned that it was publicly owned.[18] In sum, Monroe

---

[18] In its response to Monroe Grocery's additional facts, the United States asserts that it "provided a determination letter in discovery for a Stripes 2214 store with the same address and [it] is the only determination letter that references a charge letter date[d] April 2, 2009 to which the USDA did not receive a response. (Attachment 1). The store number (2214) refenced [sic] in this determination letter is different from the store number (40678) in the chart of charge letters issued to publicly owned corporations from 01/01/08 (produced 08/01/19) in Plaintiffs'

Grocery has not shown either that was similarly situated to Stripes 40678 or that the USDA's treatment of Stripes 40578 shows that the USDA purposefully discriminates on the basis of public versus private ownership.

Because Monroe Grocery has not presented evidence from which a reasonable trier of fact could conclude that the United States intentionally treated it differently from how it treated similarly situated, publicly owned stores, the United States is entitled to summary judgment.

## VI.  Conclusion.

Based on the foregoing, we will grant the United States' motion for summary judgment.  An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge

---

Exhibit F. (Doc. 112-2 ECF 2)." *Doc. 129* ¶ 57.  And the United States attached this letter. *Doc. 129-1* at 1–3.  The parties have not briefed the significance, if any, of this letter.